United States District Court
Southern District of Texas
FILED

MAY 2 1 2001

MICHAEL N. MILBY, CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CLIFTON RAY CHOYCE | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-86 |
| | § | |
| GARY L. JOHNSON, DIRECTOR, | § | |
| TDCJ-ID | § | |

## PETITIONER'S BRIEF IN SUPPORT OF HIS
## PETITION FOR WRIT OF HABEAS CORPUS

The videotape of the incident and the audiotape of the rehearing support Petitioner's allegations in his Petition for Writ of Habeas Corpus in the following manner:

**I.      Ground One:   Petitioner was deprived of an impartial disciplinary hearing:**

1.1      The audiotape of the disciplinary rehearing and its transcription (a copy of which is attached hereto as Exhibit A) show that the sole purpose of the rehearing, as far as the Hearing Officer was concerned, was to cover all bases which were not covered in the original disciplinary hearing in 1995. His whole demeanor during the rehearing illustrates Petitioner's contention that the result was a foregone conclusion.

A.      When Petitioner stated to the Hearing Officer that the videotape should have shown the Petitioner standing in front of his cell attempting to get someone's attention so that he could enter his cell, the Hearing Officer responded that, "I'm going to address that . . . I just wanted to put that in there so when you take this back to Court, everybody will know that I did review the tape." (Audiotape transcript (hereafter "AT"), p. 6, ll. 2-16).

1.      The Hearing Officer never responded to Petitioner's assertion or question. *Cite*

40.

2.    This also illustrates that the decision was a foregone conclusion because Petitioner would not "take this back to Court" unless the ruling was adverse to him. The Hearing Officer expected Petitioner to "take this back to Court" because the Hearing Officer had already made his decision, which was adverse to Petitioner, and the rehearing was a mere formality. Justice requires that the Hearing Officer be fair and impartial.

1.2    Contrary to the TDCJ's "Disciplinary Rules and Procedures for Inmates," (hereafter "Disciplinary Rules"), Section IV, B.1 and B.6, Petitioner's counsel substitute was not Petitioner's advocate. Instead, her sole purpose seemed to be (1) to prevent Petitioner from asking questions for which the Hearing Officer was not prepared and (2) to complete the prison's paperwork. During the portion of the rehearing in which she was supposed to present evidence supporting Petitioner's pleas of not guilty, she merely recited the witnesses Petitioner asked be presented, stated the contents of the two-sentence statement she obtained from a witness who corroborated Petitioner's version of the incident, stated that Officer Hester (the picket officer on the night of the incident) was in another unit, and noted that Petitioner requested the videotape of the incident, which was not available to him (AT, p. 3, l. 14 – p. 4, l. 7). She apparently did not view the tape, but seems to think that it is sufficient that the Hearing Officer did. She did not question the Hearing Officer about the Petitioner's contention that he tried to get Officer Hester to unlock his cell or what the Hearing Officer might have seen in the videotape which would support this contention. As Judge Ellington noted in her May 20, 1998 *Amended Order Denying Respondent's Motion for Summary Judgment and Granting Limited Habeas Corpus Relief* (p. 7), " . . . the incident on the tape is enough like the incident described by petitioner that the petitioner should have been allowed to present the tape . . . to support his claim that he tried to leave the day room and go back to his cell." Yet, counsel substitute did not even question the

2

Hearing Officer about that portion of the tape or ask if the person waving is in front of Cell 3, Petitioner's cell.

## II.   Ground Two:   The Petitioner's due process rights to call and cross-examine a witness were violated.

2.1    Petitioner requested that Officer Hester be present at the rehearing so that he could question him. Both the hearing Officer and counsel substitute acknowledged this request at the rehearing (AT, p. 7, ll. 3-7). The Hearing Officer read into the record Officer Hester's statement that allegedly was taken by telephone by counsel substitute. Officer Hester's statement does not support Petitioner's version of the incident, but Petitioner could not question him because Officer Hester was not present. Petitioner contends that the statement is a mere recitation of others' statements presented at his 1995 hearing. Counsel substitute or the Hearing Officer could have easily confirmed or refuted Petitioner's contention since the records of the 1995 hearing were available to them. They did not. "*Wolff* [*Wolff v. McDonnell*, 418 U.S. 539, 94 St.Ct. 2963, 41 L.Ed.2d 935 (1974)] requires that jail authorities allow an inmate who faces disciplinary proceedings and whose liberty interest is threatened to call witnesses in his defense, when permitting him to do so will not be unduly hazardous to institutional safety and correctional concerns." *Mitchell v. Dupnik*, 75 F.3d 517, 525 (9th Cir. 1996).

2.2    Petitioner expected Officer Hester to be present at the rehearing, and when he was not, Petitioner's dues process rights were violated. " . . . [T]o hold that the Due Process Clause confers a circumscribed right on the inmate to call witnesses at a disciplinary hearing, and then conclude that no explanation need ever be vouched for the denial of that right, either in the disciplinary proceeding itself or if that proceeding be later challenged in court, would change an admittedly circumscribed right into a privilege conferred in the unreviewable discretion of disciplinary board." *Ponte v. Real*, 471 U.S. 491, 498, 105 S. Ct. 2192, 2197 (1985).

3

2.3    Contrary to the requirements of Section VI, E.3, Disciplinary Rules, the Hearing Officer did not state on the written report of the rehearing the reason that Officer Hester was not produced. "Due process requires that an inmate faced with the possible revocation of good-time credits be afforded the right to call witnesses in his defense." *Whitlock v. Johnson*, 153 F.3d 380 at 3385 (7th Cir. 1998).

2.4    Although the Disciplinary Rules allow written witness statements in llieu of live testimony, the Courts have ruled that mere written statements are unacceptable. "We are also unconvinced by the prison's assertion that its policy of interviewing requested witnesses and summarizing their testimony in an unsworn report is a legitimate means of 'calling a witness' even when live testimony would be feasible." " . . . the interview policy is at best an imperfect substitute for actual testimony . . . where actual testimony is otherwise feasibly obtained. Particularly since witnesses are often the only means for an inmate to attempt to prove his version of events . . . " *Id.* at 388. "We have previously held that a blanket denial of permission for an inmate to have witnesses physically present during disciplinary hearings is impermissible, even where jail authorities provide for interviewing of witnesses outside the disciplinary procedure." *Mitchell* at 525.

2.5    Petitioner requested that the charging officer, Lt. Ambriz, be present at the hearing (AT, p. 4, ll. 10-11). The Hearing Officer contacted Lt. Ambriz by telephone during the rehearing and elicited detailed testimony from him (AT, pp. 8-12). When Petitioner asked why Lt. Ambriz had testified in 1995 that he didn't see Petitioner participate in a riot (AT, pp 12-13), Lt. Ambriz stated, "I don't recall that."

2.6    The Hearing Officer or counsel substitute could have confirmed or refuted Petitioner's assertion regarding Lt. Ambriz's 1995 testimony by checking the 1995 records to

which they had access.  They did not; they brushed off Petitioner's assertion once Lt. Ambriz stated he couldn't remember.  Why bother when the decision was already made?  When Petitioner pressed for an answer (AT, p. 13, l. 23 to p. 14, l. 7), the Hearing Officer misstated Lt. Ambriz's testimony when the Hearing Officer stated:  "Yeah, he did.  He said he was the charging officer, and he testified in '95."  Lt. Ambriz did not state that he testified in 1995; he said he couldn't remember whether or how he testified in 1995, but he couldn't see any reason why he wouldn't have testified (AT, p. 12, ll. 18-21).

2.7     Section VI, B.5 of the Disciplinary Rules allows Petitioner to request the presence of the charging officer and Section VI, E.5, requires the Hearing Officer to state on the written record of the rehearing why confrontation and cross-examination of Petitioner's accuser was not allowed.  Section VI, B.6 states: "The unavailability of the charging officer must be limited to those occasions when extreme circumstances arise."  Petitioner requested the presence of the charging officer, Lt. Ambriz, but Lt. Ambriz was not present and the Hearing Officer did not note the reason he was not present at the rehearing.

**III.     Ground Three: Petitioner was prejudiced by being retried in this case.**

3.1     In the 1995 hearing, the charge of failure to obey an order was dismissed.  At the rehearing, the charge was included.  Since the Hearing Officer had already made his decision before the rehearing and since the charge would now appear on Petitioner's record and likely would have an affect on his parole, Petitioner would have been better off accepting the initial decision, whether his rights were violated or not.

3.2     The Disciplinary Rules, Section XIII, B, require that notice of rehearing be served within 30 days from the date the appeal was granted.  This Court's order requiring that the TDCJ either restore Petitioner's lost time or rehear the matter was signed May 20, 1998.  Respondent

served Petitioner with notice of the rehearing on December 18, 1998, more than 200 days after the order was signed. Since Respondent failed to abide by its Disciplinary Rules by giving timely notice of the rehearing, the only recourse available is to restore Petitioner's lost time.

## PETITIONER'S GOOD TIME SHOULD BE RESTORED

The evidence in the rehearing that Petitioner refused to obey the original "rack up" order is suspect since

1.    The videotape does not commence until after the prison officials were suited up in riot gear and the confrontation had commenced. At this point, the refusal to obey is almost moot. The only one to see the videotape was the Hearing Officer who could not have seen Petitioner refuse to obey the rack-up order since the tape commenced after such point.

2.    There is no testimony at the rehearing from any witness other than Lt. Ambriz and Officer Hester. Petitioner's right to cross-examine each of these was impaired as described above.

## SUMMARY

1.    The Hearing Officer had already made his decision before the rehearing. This Court ordered a rehearing to insure that Petitioner's due process rights were protected. The Hearing Officer's machine-gun manner of speaking when informing Petitioner of the charges and his decision, coupled with the dismissive manner in which he received Petitioner's questions and assertions, illustrate his lack of concern for the due process rights of Petitioner.

2.    Petitioner's counsel substitute was not an advocate for Petitioner. Although she was the only tool he had to obtain evidence, she conducted only a cursory, one-day investigation, not with the goal of corroborating Petitioner's version of the incident, but apparently with the purpose of making a neat package of the prison's case. Why did she only take a two-sentence

6

statement of the witness who corroborated Petitioner's version?  Why didn't she review the 1995 hearing to either corroborate or refute Petitioner's assertions regarding Lt. Ambriz?  Did she ask Officer Hester about Petitioner's assertion that he tried to get into his cell by waving to get Officer Hester's attention?  If so, why was that not in his statement?

**CONCLUSION**

Respondent's failure to protect Petitioner's due process rights as illustrated above warrant reversal of the loss of good time.

Respectfully submitted,

LAW OFFICE OF PAUL G. KRATZIG

Paul G. Kratzig
State Bar No. 11710500
600 Leopard Street, Suite 2100
Corpus Christi, Texas 78473
Telephone:  (361) 883-3563
Telecopier:  (361) 883-0210

**ATTORNEY FOR PETITIONER**

OF COUNSEL:

WHITE, HUSEMAN & PLETCHER
600 Leopard, Suite 2100
Corpus Christi, Texas 78473

7

# CERTIFICATE OF SERVICE

I certify that on this _____ 18th day of May, 2001, a true and correct copy of the foregoing document was served upon the following counsel of record by the method indicated below.

PAUL G. KRATZIG

**By Fax #512/936-1280**
**And by Certified Mail,**
**Return Receipt Requested, to:**

RETURN RECEIPT #7099 3220 0001 2926 3290
Ms. Denise A. Villarreal
Assistant Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

CLIFTON RAY CHOYCE          *
                            *
VS.                         *     NO. C-00-86
                            *
GARY L. JOHNSON             *

## TAPE TRANSCRIPTION RE: CLIFTON RAY CHOYCE

COPY

REPORTER:   MELISSA PARKHILL
TRANSCRIBED:   APRIL 17, 2001

~~~~~~~~A Better Court Reporting Service, Inc.~~~~~~~~

TRESSA GRANGER, PRESIDENT

Certified Shorthand Reporters

602 WEST 9TH STREET        EXHIBIT A        1-800-478-1989
AUSTIN, TEXAS 78701                         (512) 478-1989

1

1    IN THE UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF TEXAS

3           CORPUS CHRISTI DIVISION

4

5

CLIFTON RAY CHOYCE,              *

6        Plaintiff

7   VS.                          *     CA NO. C-00-86

8   GARY L. JOHNSON,
         Defendant              *

9

10

11   ------------------------------------------------

             TAPE TRANSCRIPTION

12          RE: CLIFTON CHOYCE
               MAY 18, 2000

13   ------------------------------------------------

14

15

16        TAPE TRANSCRIPTION regarding Clifton Choyce

17   Rehearing was transcribed in the above-styled and

18   numbered cause on the 17th day of APRIL, 2001, by

19   MELISSA PARKHILL, Certified Shorthand Reporter No. 5354

20   in and for the State of Texas.  The following

21   proceedings were had to wit:

22

23

24

25

A BETTER COURT REPORTING
·(800) 478-1989 or (512) 478-1989

2

1      HEARINGS OFFICER:  -- Inaudible -- on the

2   justice decision on the parties listed -- Inaudible.

3   Failure to do so will result in a -- inaudible.

4   McConnell Unit.  This evidentiary hearing on Inmate

5   Choyce, Clifton 380334, being reported 12-21-98 at 11:30

6   a.m.  He is represented by counsel substitute --

7   inaudible.  Are you ready to proceed?

8      COUNSEL SUBSTITUTE:  Yes.

9      HEARINGS OFFICER:  Inmate Choyce,

10  disciplinary report 990118440 on 2-11-95 11:40 p.m. at 8

11  building.  AK-1 cell block -- inaudible -- Offender

12  Choyce intentionally participated with Inmate Hicks,

13  Norris 505593 and Diggs, Ernest 535417 with 15 inmates

14  in an attempt to disrupt the unit operation by refusing

15  to exit the K-1 cell block dayroom and return to their

16  cells and create a danger and damage to property and/or

17  injury to persons and substantially obstructing the

18  performance of unit operations.  Offender Choyce was --

19  inaudible.

20      Do you understand the charges?  You're

21  being charged with a Code 8 riot.

22      INMATE CHOYCE:  Yes, sir.

23      HEARINGS OFFICER:  And Code 24, offender

24  refusing to obey orders.  Did you get a copy of these

25  charges on the 18th of December, 1998?

A BETTER COURT REPORTING
(800) 478-1989 or (512) 478-1989

1          INMATE CHOYCE:  Yes, sir.

2          HEARINGS OFFICER:  And the time of the

3  charge your counsel substitute advised you of your due

4  process rights, your right to call and question

5  witnesses, including the charging officer, and your

6  right to present evidence on your own behalf?

7          INMATE CHOYCE:  Right.

8          HEARINGS OFFICER:  Okay.  How do you

9  plead to Code 8 riot?

10          INMATE CHOYCE:  Not guilty.

11          HEARINGS OFFICER:  How about the refusing

12  to obey an order?

13          INMATE CHOYCE:  Not guilty.

14          HEARINGS OFFICER:  Evidence on behalf of

15  offender?

16          COUNSEL SUBSTITUTE:  Yes, Captain.  He

17  was requesting a couple of witnesses, one from Inmate

18  Hicks, Norris, T.D.C. number 505593.  And for the

19  record, Captain, this inmate is currently at the

20  Coffield Unit.  He states he was not involved in the

21  case.  The officer started the riot by accidentally

22  shooting off the gas gun.

23          He was requesting Officer Hester as a

24  witness.  Also for the record, this officer is no longer

25  here at the McConnell Unit.  He is now at the Clemens

4

1   Unit.  And I do have a statement from him, which I'll
2   submit into the record.

3              Also, he was requesting as documentary
4   evidence a videotape that was videoed that day.  For the
5   record, Captain, the videotape is not accessible to the
6   inmate.  However, the videotape has been reviewed by the
7   E.H.O. captain.

8              Choyce, you may now make a statement in
9   your defense.

10             INMATE CHOYCE:  Yes, I want the charging
11  officer.

12             COUNSEL SUBSTITUTE:  Okay.  Do you want
13  to make a statement in your defense?

14             HEARINGS OFFICER:  You have no statement?

15             All right.  As further documentation in
16  this case I do have a writ of final judgment from Janice
17  Ellington.  She's a United States Magistrate judge.
18  This case was overturned in federal court.  However, she
19  did authorize in the final judgment T.D.C. to rehear
20  this case at our discretion.  And that's the reason the
21  offense date is 2-11-95, and the hearing date is
22  12-18-98.  We have decided to proceed with a rehearing
23  on this issue.

24             In reference to Ms. Bunton's
25  documentation, the inmate did request the videotape of

1    the incident.  The inmate is not permitted to view or to

2    use the major use of force tapes as documentary

3    evidence.  However, I did receive a copy of the

4    videotape of the incident from the attorney general's

5    office, Ms. Murchin's office, on the 16th of December,

6    and I have reviewed the tape prior to having this case

7    regenerated and rehearing this case.

8              I found no exculpatory evidence on the

9    tape that would clear Inmate Choyce from participation

10   in this incident.  I did see Inmate Choyce engage in

11   behavior that he's been charged with as far as roaming

12   around the dayroom and refusing to obey orders.  I did

13   see evidence of that.  But I did not find any

14   exculpatory evidence to clear him of charges of

15   participating in the riot.

16             Let's see.  Do you guys have anything

17   else in defense?

18             COUNSEL SUBSTITUTE:  Do you have anything

19   else?

20             INMATE CHOYCE:  Yeah, I was charged with

21   rioting.  You say you didn't see no -- I never

22   participated in no riot.  I was in the dayroom because

23   it was dayroom time.  But I tried to get -- You should

24   have seen me standing by the -- inaudible -- trying to

25   wait for the officer to let me in the cell which Hester

1   never opened the door.

2                   HEARINGS OFFICER:  Okay.  I'm going to

3   address that.  I just wanted to put all of that in the

4   record because, as you know, you're pretty up on this

5   case in Court; right?

6                   INMATE CHOYCE:  Yeah.

7                   HEARINGS OFFICER:  Okay.  This case was

8   overturned because Captain Bell in 1995 failed to review

9   the videotape, which is a violation of your due

10  process.  And I just put all of that in there to say

11  that I did review the tape.  Okay.  I did look at that

12  tape.  So I just put that in there for the record.

13  We're going to be addressing all of those other issues

14  as we go along.  I just wanted to put that in there so

15  when you take this back to Court, everybody will know

16  that I did review the tape.  Okay?

17                  INMATE CHOYCE:  Okay.

18                  HEARINGS OFFICER:  So do you have any

19  defense?  How are we doing to argue defense?

20                  COUNSEL SUBSTITUTE:  We have nothing

21  further in defense, Captain.

22                  HEARINGS OFFICER:  Now, received in

23  evidence -- in this report of 990118440, which was read

24  at the beginning of this proceeding -- inaudible.  At

25  this time Officer Hester, who I believe at the first

1   hearing you requested Hester as a witness, did you not?

2            INMATE CHOYCE:  Yes.

3            HEARINGS OFFICER:  Okay.  Do you request

4   him as a witness for this proceeding or did you just --

5   inaudible?

6            COUNSEL SUBSTITUTE:  No.  He requested

7   Hester.

8            HEARINGS OFFICER:  Okay.  Officer Hester

9   stated that day on 2-11-95 there had been a stabbing on

10  AKG section which started racking up each section --

11  excuse me -- starting with 2 section.  Next was 3

12  section which we ended up gassing because they refused

13  to rack up, and tensions were high.

14            By the time we got to AK-1 section, the

15  inmates knew we were coming and prepared for the gas.

16  Once we got to 1 section, all inmates were ordered to

17  rack up.  Many of them refused, which Inmate Choyce was

18  one of them.  Some inmates had gotten a trash can and

19  placed it covering the face slot on 1 section door.

20  Inmate Choyce was one of the inmates who were trying to

21  seal the trash can off by using a blanket or towel.

22  Lieutenant Blackwell had used a face slot bar to remove

23  the trash can anyway, and chemical agents were applied.

24  The dayroom was filled with smoke, and we went in.  I

25  don't recall where Inmate Choyce was after this point.

1   Various incident I was on the floor and I was part of

2   the five-man riot team and I saw the whole incident.

3                  That was inmate -- I mean, Officer

4   Hester's statement taken by phone from the Clemens Unit

5   by counsel substitute.

6                  At this time I will pause.

7            (Discussion off the record.)

8                  HEARINGS OFFICER:  This is a continuation

9   of disciplinary board number 990118440 involving Inmate

10  Choyce, Clifton 380334.  I recessed to contact the

11  charging officer who I now have with me on the

12  telephone.

13                 Would you please state your name and rank

14  for the record, please.

15                 LIEUTENANT AMBRICE:  Lieutenant Ambrice.

16                 HEARINGS OFFICER:  Lieutenant Ambrice,

17  you were Sergeant Ambrice February of '95, were you

18  not?

19                 LIEUTENANT AMBRICE:  Yes, sir.

20                 HEARINGS OFFICER:  Okay.  And you did

21  write a disciplinary report on Inmate Choyce which read

22  on 2-11-95 at 11:45 p.m. at AK-1 cell block dayroom

23  Offender Choyce intentionally participated with Inmate

24  Hicks, Norris 505593 and Diggs, Ernest 535417 and 15

25  other inmates in an attempt to disrupt the unit

CMPDF - www.fesio.com

1   operations by refusing to exit the K-1 cell block

2   dayroom and return to their cells and creating a danger

3   of damage to property and/or injury to persons and

4   substantially obstructing the performance of unit

5   operations.  Offender Choyce was ordered by Sergeant

6   Ambrice to go to his assigned cell.  Said offender

7   failed to obey the order.

8                Do you recall writing this case and

9   recall the incident?

10               LIEUTENANT AMBRICE:  Yes, sir.

11               HEARINGS OFFICER:  Okay.  Could you give

12  me -- we already know -- it's a foregone conclusion that

13  there was indeed a riot and there was indeed a stabbing,

14  that we utilized chemical agents.  We understand all of

15  that.  But could you narrow your comments down to the

16  offender's direct participation in this incident which

17  caused him to be written this disciplinary report for

18  riot, please.

19               LIEUTENANT CHOYCE:  Yes, sir.  All of the

20  inmates were instructed to go to their cells and Inmate

21  Choyce was just standing around and didn't comply with

22  all of our orders so we could gain control of that one

23  section.

24               HEARINGS OFFICER:  Okay.  So he refused

25  -- so he initially refused in a group participation of

CMPDF - www.fesite.com

1    15-plus inmates to obey the orders to rack up?

2                   LIEUTENANT AMBRICE:  Yes, sir.

3                   HEARINGS OFFICER:  Okay.  And, you know,

4    what else happened?

5                   LIEUTENANT AMBRICE:  He --

6                   HEARINGS OFFICER:  Was he passive -- Let

7    me ask you this:  Was he passively resistant in doing

8    this or was he doing anything else that --

9                   HEARINGS OFFICER:  Inaudible -- He was

10   just standing around just ignoring our orders.  Later on

11   -- inaudible -- Offender Diggs had a trash can propped

12   up against the door to cover up the face slot --

13   inaudible -- to the dayroom.  And Offender Choyce then

14   threw a rag or a towel around the trash can that was

15   being used to serve as a type of -- inaudible -- would

16   not seep through the cracks between the door and the

17   trash can itself.

18                   HEARINGS OFFICER:  So when the offender

19   testified to me at the defense portion of this hearing

20   that the only thing he was guilty of was not being able

21   to get in his cell -- he said that he went over to his

22   cell and was standing by the cell door waiting for it to

23   open, and he never participated in any kind of

24   disruptive or riotous behavior, would that be a

25   conclusion that you can draw as being an eyewitness to

1   the incident?

2               HEARINGS OFFICER:  Could you repeat the

3   question, sir.

4               HEARINGS OFFICER:  I said the offender

5   has testified that the only thing he did was walk over

6   -- he was in the dayroom because it was dayroom time --

7               LIEUTENANT CHOYCE:  Right.

8               HEARINGS OFFICER:  -- that he walked over

9   to his cell and nobody would let him in his cell and

10  that's the only thing he's guilty of.  Now, would that

11  be a conclusion that you would draw as an eyewitness to

12  this incident?

13              LIEUTENANT AMBRICE:  No.  He participated

14  and didn't go to his cell because I witnessed him just

15  standing around not going back to his cell and

16  participated by throwing the rag or the towel on top of

17  the trash can to assist Diggs in trying to keep us from

18  entering -- inaudible -- into that section.

19              HEARINGS OFFICER:  Okay.  Lieu, this is

20  almost four years after the fact.  Is there any way that

21  you can be confused or is there any way that you could

22  be mistaken or have forgotten or --

23              LIEUTENANT AMBRICE:  No, sir.  Due to the

24  fact that later on that same night Choyce was involved

25  in the force also.  So that stayed with my mind because

1    he was one of the ones that, you know, we had trouble --
2    inaudible -- throughout the night.
3                    HEARINGS OFFICER:  Okay.  Questions?
4                    INMATE CHOYCE:  Yeah, I want to know
5    how --
6                    COUNSEL SUBSTITUTE:  You need to ask
7    through me.
8                    INMATE CHOYCE:  I want to know how he
9    could testify to that today when he couldn't testify to
10   it in the main trial.  He didn't testify to that in my
11   trial.  He testified to the fact that I -- he didn't see
12   me participating in no riot.
13                    COUNSEL SUBSTITUTE:  Lieutenant Ambrice?
14                    LIEUTENANT AMBRICE:  Yes, ma'am.
15                    COUNSEL SUBSTITUTE:  Back in '95 Inmate
16   Choyce said you couldn't testify to any of this
17   information; is that true?
18                    LIEUTENANT AMBRICE:  I do not remember.
19   I know that we ran disciplinary on all of the offenders
20   back then.  I don't see why I wouldn't be able to
21   testify back then unless they did not call me.
22                    COUNSEL SUBSTITUTE:  What did he say back
23   in '95?
24                    INMATE CHOYCE:  He said that he wrote the
25   case so he couldn't -- when I asked him -- inaudible --

1    when they asked him -- when Lieutenant -- inaudible --
2    asked him whether I participated in the riot or not, he
3    said he couldn't testify to that.  He don't know.
4                COUNSEL SUBSTITUTE:  Is it true back in
5    '95 that you testified that you weren't sure if Inmate
6    Choyce was a participant in the riot or not?
7                LIEUTENANT AMBRICE:  No, ma'am, I don't
8    recall that.
9                INMATE CHOYCE:  How can he recall whether
10   I did all of that today?
11               HEARINGS OFFICER:  Have you got any other
12   questions for Lieutenant Ambrice?
13               INMATE CHOYCE:  I don't want to ask him
14   no questions.
15               HEARINGS OFFICER:  Are you sure?
16               INMATE CHOYCE:  We -- inaudible -- need
17   to ask him.
18               HEARINGS OFFICER:  Huh?
19               INMATE CHOYCE:  You ain't asked him what
20   I asked him yet.
21               SUBSTITUTE COUNSEL:  What was it?  What
22   did I not ask him that you wanted to ask?
23               INMATE CHOYCE:  I want to know how can he
24   testify to all of that today if he ain't sure about the
25   what he testified to back in '95.  All of a sudden he

1   said I was participating with towels and all of that.

2               HEARINGS OFFICER:  She already asked that

3   question.

4               INMATE CHOYCE:  What I'm saying is I

5   ain't got no answer to that question yet.

6               HEARINGS OFFICER:  Yeah, he did.  He said

7   he was the charging officer, and he testified in '95.

8               INMATE CHOYCE:  I don't have any

9   questions then of this witness -- inaudible.  Give me my

10   papers so I can go.

11               HEARINGS OFFICER:  All right.  Do you got

12   any other questions of this officer?

13               COUNSEL SUBSTITUTE:  No, we have no other

14   questions.

15               HEARINGS OFFICER:  All right.  Thanks,

16   Lieu.

17               LIEUTENANT AMBRICE:  Yes, sir.

18               HEARINGS OFFICER:  Close this link of

19   communication.

20               COUNSEL SUBSTITUTE:  Captain, Choyce has

21   had no similar cases in the past 180 days.  Also, taking

22   consideration the inmate's statement that he never

23   participated in a riot and that he was standing at his

24   cell door but the door wouldn't -- but the officer

25   wouldn't let the door open.  If you do feel a conviction

1    is necessary, we are requesting leniency if you do find

2    a guilty.  Also, Captain, taking into consideration

3    Inmate Hicks' testimony, his witness, who also states

4    that Inmate Choyce was not involved.

5              Choyce, do you have anything else you

6    want to add before we close?

7              INMATE CHOYCE:  I just want -- I just

8    want -- How many times can I be punished on one case?

9              HEARINGS OFFICER:  Punished?  What are

10   you talking about?

11             INMATE CHOYCE:  They took 500 days and

12   gave me 45 days on the  -- inaudible.

13             HEARINGS OFFICER:  You know, the thing is

14   on a rehearing I cannot give you anymore punishment than

15   you received at the first one.

16             INMATE CHOYCE:  (Inaudible.)

17             HEARINGS OFFICER:  No.  What I'm saying

18   -- No, I'm not saying I can't give you anymore.  What

19   I'm saying is they restored.  When the Federal Court

20   gave you a writ of habeas corpus on this case, they

21   restored your 500 days of good time.  Okay.  Now, the

22   45 --

23             INMATE CHOYCE:  That I will lose.

24             HEARINGS OFFICER:  Go ahead and tell me.

25   What?

1          INMATE CHOYCE:  My understanding was that

2     you can try the case or give me back my 500 days was my

3     understanding of the case.

4          HEARINGS OFFICER:  Well, that's what

5     we're doing now.  So what I'm saying is the punishment

6     will not exceed anything that you experienced in '95.

7          INMATE CHOYCE:  Yes, sir.

8          HEARINGS OFFICER:  Have you got anything

9     else, Ms. -- inaudible?

10         COUNSEL SUBSTITUTE:  No, we have nothing.

11         HEARINGS OFFICER:  Let me put it on

12     pause.

13          (Discussion off the record.)

14         HEARINGS OFFICER:  You're found guilty --

15     inaudible -- of reporting officer's testimony at this

16     hearing, the statement received from Hester and the

17     videotape of the riot dated 2-11-95.  The punishment is

18     going to be -- inaudible -- forfeit your 500 days of

19     good calendar time.  Inaudible -- punishment.  You have

20     a right to appeal my decision -- inaudible.  Inaudible

21     -- on penalty imposed.  Given the final -- inaudible.

22     Counsel substitute is also -- inaudible -- assistance

23     and also provide you with a copy of the record of this

24     hearing.  Under the note section I did put reviewed tape

25     of riot, no exculpatory evidence on Inmate --

1   inaudible.   This hearing is concluded.

2                        (Tape ended.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   The State Of Texas)

2   County Of Travis  )

3

4        I, Melissa Parkhill, the undersigned certified

5   shorthand reporter of Travis County, Texas, certify that

6   the caption to this tape correctly states the facts set

7   forth herein; that the proceedings were correctly

8   reported in typewriting by me and have been transcribed

9   into typewriting under my direction and supervision in

10  the foregoing transcript, to the best of my ability; and

11  that said transcript contains a correct record of the

12  proceedings had at said time and place.

13

14       Given under my hand and official seal of office

15  this the 17th day of April, 2001.

16

17

18  _Melissa  Parkhill_____
    Melissa Parkhill

19  Certified Shorthand Reporter
    State Of Texas, CSR# 5354

20  Cert. Expires 12/31/2002
    A Better Court Reporting, Inc.

21  P.O. Box 685229
    Austin, Texas 78768

22  (512) 478-1989

23

24

25